In the Matter of the Application of TONY FORTINO, Petitioner, for a Certiorari Order against THE STATE LIQUOR AUTHORITY, Respondent.

Third Department, June 25, 1936.

*Halter, Sullivan & Einhorn* [*Edward J. Halter* of counsel], for the petitioner.

*Nelson Ruttenberg* [*Ralph G. Gordon* of counsel], for the respondent.

McNAMEE, J. The physical facts in the case under review are not in dispute. The petitioner owned the property at 8 Burgoyne

road, Ticonderoga, which were occupied by himself, his wife and four children as their home. A part of the residence was transformed into a restaurant which was thereafter conducted by the petitioner. On July 1, 1935, a renewal license was issued to him for the sale of beer for consumption on the premises, in connection with his restaurant. His wife did the cooking.

Standing against the residence and restaurant building was a garage where the family automobile was kept, and " in back of the house " was another small structure which was evidently built against the dwelling, but the size or form thereof was not shown, and was referred to in the evidence as a dog house, an ice box, and a platform used in " hanging up clothes." At the time in question it had in it a cake of ice and a quantity of straw, and a dog was tied to it. The entrances to the garage, and to the dog house, and to the dwelling or restaurant were entirely separate, and there was no entrance or direct passage from one to the other. There had been " quite a few " investigations of these premises by representatives of the Liquor Authority, pursuant to the Alcoholic Beverage Control Law, one as late as July 29, 1935, but no violations were discovered.

The father of Mrs. Fortino, wife of the licensee, died at his home in Whitehall on April 22, 1935; and Mrs. Fortino was appointed administratrix of his estate. A part of the assets left by the decedent was 160 gallons of wine, which was in his residence at the time he died. The chief of police of Whitehall discovered on August 1, 1935, that a part of this wine had been stolen, and gave notice to the administratrix that she should take away what was left. The following day she went to Whitehall and bottled the wine, about seventy quarts, and conveyed it in the family automobile to her home in Ticonderoga, and placed the unloaded automobile in the garage.

It was her intention to store the wine about three blocks from her home, after dark, and hold it for disposition until she could confer with her brothers. She was not familiar with the law as to storage of intoxicants, or as to bonded warehouses. That night she expected to entertain company, and had taken two of the bottles of wine from the automobile and placed them on the ice in the " dog house," with the intention of using them in her family at dinner that evening.

Within an hour after the arrival of Mrs. Fortino at her home with the wine from Whitehall, the investigator of the Authority again came to the premises after receiving a complaint, discovered the wine in the garage, and seized the two bottles that were on ice in the dog house.

The investigator thereupon filed a formal complaint against the licensee, and a hearing was held by the State Liquor Authority to revoke his license, on the ground of a violation of section 108 of the Alcoholic Beverage Control Law. On September 21, 1935, the Authority made its determination revoking the license of the petitioner, and forfeiting his bond.

There is no evidence in the record that any wine or liquor was ever sold or kept for sale on the licensed premises; on the contrary, the proof is that there were no such sales or other violations. The wine in question was evidently available to the administratrix at all times after her father's death in April, or at least after the grant of administration, if it were not in her legal possession as such representative; and although she had a clear legal duty to preserve this asset of the estate, there was no proof that any of it was brought to Ticonderoga until August second.

The statute mentioned forbids the holder of a beer license to " keep or permit to be kept or consumed on the licensed premises any liquor or wine." And a licensee has been held responsible for the conduct of his agent in the unlawful sale of liquor on the licensed premises. (*People* v. *Hawk*, 156 Misc. 870; affd., 268 N. Y. 678.)

Were it to be assumed for the moment that Mrs. Fortino, as cook, was the agent of the licensee, and that the places where the wine was discovered were parts of the building containing the licensed premises, it well may be doubted that the Legislature intended to visit with such severe penalties the naive act of the administratrix in bringing the wine to her home openly in the performance of an official duty, however ill advised the act. The wife volunteered in her testimony that she intended to use in her family the two bottles seized. Were her home located in any building other than the one in which the restaurant was located, no one would suggest that her intended act when consummated would be a violation of law. It is true that the statute forbids that wine or liquor " be kept or permitted to be kept " on the licensed premises. But the law permits the sale of beer, wine and liquor in a part of the same building where the licensee and his family may have their home; and there is commonly an entrance from the one to the other. This is true of practically all substantial hotels where liquor is sold. It is only reasonable to infer that the Legislature did not intend to forbid the presence, for family use, of wine or liquor in that part of the premises devoted to the family dwelling, whether for dietary, social or medicinal purposes. There is no intention in the statute to control the home of the licensee, nor of its contents or activities, in the absence of law violation, or of an intention to infringe the law. The separate home of the licensee when lawfully

used is not comprehended within the scope or the meaning of the section in question.

The petitioner further urges that the places where the wine was found were no part of the "licensed premises." Evidently the dog house or the garage was no part of the building where the petitioner's family lived, or where the restaurant business was transacted, although contiguous thereto. There was no access to either of these structures from the building where business was done, or from the family dwelling. Section 108 does not define the expression "licensed premises," nor does the application for the license limit the particular location where beer may be sold, except to state the residence and post office address of the licensee as 8 Burgoyne road, Ticonderoga, Essex county, and that the licensed premises are located between Champlain avenue and Roger street. The Authority takes the position that the dog house and garage were used "in connection with the petitioner's restaurant," and that the dog house was "easily accessible from the kitchen of the licensed premises." The statute in its present form, however, does not assume to include property so used, or so accessible. The only attempt made in the statute to define the term "licensed premises," in so far as called to our attention, is by section 3, in the following language: "Definitions. Whenever used in this chapter, unless the context requires otherwise: * * * 7. 'Building containing licensed premises' shall include the licensed premises and also any part of a building in which such premises is contained and any part of any other building connected with such building by direct access or by a common entrance." This definition appears to predicate, in the first instance, that "licensed premises" shall be a location within a building, and shall include any part of that building, and any part of any other building connected therewith "by direct access or by a common entrance." There is nothing in this record to indicate that either the garage or the dog house was any part of the building in which the restaurant was located; and it is clear from the evidence that there was no direct access nor any common entrance. Although the language used in this statutory definition may be unsatisfactory, the Legislature has assumed to indicate what "licensed premises" shall be, and it is not for the court to alter the limitations thus fixed by the statute. The former Liquor Tax Law defined the "premises" with reference to the place where liquor could be legally sold, as "a hotel, restaurant, saloon, store, shop, booth or other place, or in any outbuilding, yard or garden appertaining thereto or connected therewith." And a corresponding description was used in that law in connection with limited licenses, as to the place where sales

of liquor were forbidden. (Laws of 1896, chap. 112, § 11.) Of course our present statute contains no such comprehensive definition as to the place or places where wines and liquor may not be kept in connection with the restaurant where beer may be lawfully sold. But the Authority urges that the definition of the statute is too restricted, and to some extent ineffective, for the purposes of enforcement. If so, such inadequacy as exists in that particular must be supplied by the Legislature. Because of the limitations indicated, we may not say the places where the wine was found were parts of the licensed premises.

The determination of the State Liquor Authority should be annulled, with costs.

HILL, P. J., CRAPSER, BLISS and HEFFERNAN, JJ., concur.

Determination of the State Liquor Authority is annulled, with fifty dollars costs and disbursements.